UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. MJ19-190 |
| Plaintiff, | Docket No. 2:19CR00097RSM-001 |
| vs. | |
| CHASE COLASURDO, | DEFENDANT'S PRE-SENTENCE REPORT |
| Defendant. | |

## I.   <u>INTRODUCTION</u>

It is my opinion that Mr. Colasurdo was acutely psychotic at and near the time of these crimes he is presently charged with and his thoughts and actions were directly related to his decompensated psychiatric state.

Dr. Brent Oneal, *Forensic Psychological Evaluation*, p. 12, 10/08/19, Exhibit 1.

Chase Colasurdo, although just 27 years old, has a significant and well documented history of major mental illness. In 2010, he was involuntarily committed to Fairfax Psychiatric Hospital. In 2015, he was taken by police to the psychiatric unit at

DEFENDANT'S PRE-SENTENCE
REPORT -- 1

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

Evergreen Hospital and, after a few days, was again involuntarily committed to Fairfax Psychiatric Hospital. In 2019, after weeks of posting irrational and erratic statements on the internet, Mr. Colasurdo was arrested. As a result of that arrest, he is now before the Court for sentencing on two counts of Interstate Threats, involving four public figures.

Mr. Colasurdo, by and through his counsel of record, moves this court for the following relief:

1.     That the Court decline to apply the upward adjustments advocated by the Government for the reasons and argument stated in the Defendant's Objections and Supporting Memorandum in Opposition to Proposed Upward Departures. (Separately briefed and filed, incorporated herein by this reference.)

2.     That the Court provide Mr. Colasurdo a 3-level downward departure for his acceptance of responsibility and his early notification to the government of his intent to forego trial and plead guilty.

3.     That the Court provide Mr. Colasurdo an additional 2-level downward departure for Mr. Colasurdo's "extraordinary acceptance of responsibility."

4.     That the Court grant Mr. Colasurdo a 7-level downward departure pursuant to U.S.S.G. §§5K2.13 because Mr. Colasurdo's offenses were committed while he was suffering from a "significantly reduced mental capacity."

5.     That the Court grant Mr. Colasurdo additional downward departure based on U.S.S.G. § 5K2.0 and his high potential for mistreatment while he is in BOP custody and should receive a downward departure because lengthy incarceration in this case would be contrary to 18 U.S.C. §3553(a) based upon the fact that the defendant's illness can be effectively treated.

DEFENDANT'S PRE-SENTENCE
REPORT -- 2

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

6. That, in the event Mr. Colasurdo is sentenced within his base offense level standard range of 10-16 months, the court order Mr. Colasurdo to be supervised in the community by the Department of Probation for a period of five years, instead of the statutory maximum of three years as provided U.S.C. 3538(b)(2).

## II.   APPLICABLE FACTS

**Family History:** Mr. Colasurdo was born and raised in Redmond, Washington. His brother, Grant, who is two years older, is married, steadily employed, is free of any mental health issues and has never been in trouble with the law.

Neither of Chase's parents have a history of mental illness. Before retiring, Chase's father worked as an architect. His mother is employed as a fire-safety engineer.

Chase was raised in a home where anger and strife were the norm. Chase reports his father was very bad tempered with little patience. Chase often felt it was safer for him not to speak around his father in order to ensure he would not have to face his father's wrath.

Chase's parents divorced when he was seven. The divorce was extremely difficult for him. His mother moved out into the country while his dad remained in the family home.

Although he's always been physically slight, growing up Chase expressed an interest in serving in the military. Chase has always had a great admiration for his grandparents. Both of his great-grandfathers served in the armed forces in WWII. Chase's maternal great-grandfather fought against Nazi forces in Europe, and his paternal great-grandfather was a submariner in the Pacific.

DEFENDANT'S PRE-SENTENCE
REPORT -- 3

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

Chase attended Lake Washington High School. He had a limited group of friends and was somewhat socially active. Chase graduated from high school in 2009 with average grades.

**Since High School, Chase's untreated mental illness has taken over his life:**

When high school ended, Chase's parents began to notice more frequent bouts of unusual behavior in Chase. That unusual behavior included his experiencing audio hallucinations, his refusing to eat for fear he had been poisoned, and his making terrified phone calls to his mother claiming people were after him.

Slowly, Chase's childhood friends stopped associating with him. As a result, he became more and more socially isolated.

By 2010 Chase's behavior had become consistently alarming. He'd lost a significant amount of weight, was frequently self-medicating by smoking marijuana, and he spent much of his time absorbing information off of the internet. Chase began to express the belief that a group of "Illuminati" were preparing to attack earth and cause a catastrophic event which would result in the large-scale loss of life. He became convinced his house had been wired in order to keep him under observation, that the label on the Coca-Cola cans was from the devil, and people were plotting against him.

**Chase is Involuntarily Committed to a Psychiatric Hospital:** Chase had had a long-time interest in the military and in firearms ownership. In 2010, after observing increasingly erratic behavior, Chase's mother took possession of a handgun Chase owned and turned it over to the Bellevue Police Department. She then contacted a Designated Mental Health Professional ("DMHP") who determined that Chase's mental illness had reached the point where he should be involuntarily committed. Chase was involuntarily

DEFENDANT'S PRE-SENTENCE
REPORT -- 4

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

committed to Fairfax Psychiatric Hospital. He was diagnosed as suffering from Psychosis Not Otherwise Specified. Chase was involuntarily held in the psychiatric hospital for several days.

After his release, Chase blamed his mother for his having been involuntarily committed. He moved in with his father. Over the next several years he rarely spoke with his mother.

His parents continued to communicate with each other about Chase but were unsure what to do with him. They loved him deeply and he had been a wonderful child. Neither really wanted to believe that Chase's mental health issues were permanent. His mother hoped his erratic behavior could be explained by the fact that he smoked marijuana.

Chase continued to sporadically make delusional statements, claiming that people or organizations were watching him or conspiring against him. He was able to hold menial labor jobs for short periods of time. He began training at a mixed martial arts style gym in order to prepare himself for what he "knew" to be an inevitable attack.

**Chase Calls The Police And Informs Them His Dad is Making a Bomb:** Near the end of 2014 leading into 2015, Chase's delusional behavior began increasing. In May of 2015, Chase called the police and reported that his father had been acting suspiciously. After talking with Chase, the police performed a "welfare check." When police arrived at his father's home, Chase explained that his father was making a bomb in the basement. As proof, Chase showed the police a sheet of guitar music explaining that those documents "proved" that his father was making a bomb. Redmond P.D., Incident No. 15-008505. The police took no action.

DEFENDANT'S PRE-SENTENCE
REPORT -- 5

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

**Chase is Arrested For Assaulting A Member of a "Rape Ring" Who Was Trying to Kill Him:** Weeks after the "bomb" incident, Chase appeared at the MMA gym where he'd been training and he randomly began fighting with Matt Hume, a professional MMA fighter who managed the gym. Chase also began attempting to assault with Orlando Huff, a 6'3" 240-pound long-time professional football player who trained at the gym. Chase was quickly overpowered and Kirkland Police were called.

Chase was completely psychotic. The police restrained and transported Chase directly to the psychiatric unit of Evergreen Hospital in Kirkland.

> This is a 23-year-old man admitted to the emergency department and now detained under danger to self and grave disability. The patient is clearly grossly psychotic with marked paranoid delusions... I am implementing olanzapine as an antipsychotic agent for this grossly ill young man. We will inject the patient because he is in restraints and at this time cannot safely take oral medication... He believes that Matt Hume is raping him and others and runs a "rape ring"... He states the officers are in on the "rape ring" and Matt Hume is able to mind control others. He also believes he is being poisoned by others.

Ex. 1, Psych. Eval. p.4.

Chase arrived in the hospital psych unit in a fully psychotic state. He believed the hospital staff was trying to kill him and was pumping poison gas into his room. Desperate to save his own life, he began struggling with anyone who came near his gurney. An armed officer entered Chase's room. The officer, wearing his firearm, approached Chase who, consistent with his delusional state, believed the officer was

DEFENDANT'S PRE-SENTENCE
REPORT -- 6

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

there to shoot him. Although the officer alleged Chase had attempted to grab his firearm, the in-room video did not support that story.[1]

**Chase is Again Involuntarily Committed to a Psychiatric Hospital:** After three days in the psychiatric ward at Evergreen Hospital, Chase was transferred to Fairfax Psychiatric Hospital. He was held in the psychiatric hospital for 17 days.

> The patient is a very poor historian. ...He is quite suspicious and guarded... Affect: Increased, bizarre, detached, and labile. Mood is anxious and elevated. Speech: Rapid and pressured. Thought process: Seems illogical, latent. Thought content: He seems to be paranoid, grandiose, and has had multiple delusions... His judgment is limited... Insight is poor...

Ex. 2., Evergreen Hospital Psych Eval, 2015.

As a result of his actions at the MMA gym and Evergreen Hospital, Chase was charged with two counts of Assault in the Third Degree in King County Superior Court and two counts of assault in Municipal Court.

**While Under The Supervision of Mental Health Court, Chase's Condition Dramatically Improves:** Both the King County prosecutor and Municipal Court prosecutor assigned to prosecute Chase recognized that he suffered from serious mental illness and concluded that incarceration wouldn't serve a productive purpose. The felony

---

[1] Although Chase told hospital staff that he had ingested methamphetamine, like many mentally ill persons, Chase lied about taking the drug in an effort to avoid being involuntary institutionalized. To rule out the possibility that Chase's erratic behavior could be drug related, the hospital tested two different samples of Chase's blood. Those separate blood tests both confirmed that Chase had not ingested methamphetamine or any other drug, that could have caused his psychotic state.

DEFENDANT'S PRE-SENTENCE
REPORT -- 7

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

charges against Chase were reduced and he was fostered into the King County Mental Health Court program.

Over the next two years while under the supervision of Mental Health Court, Chase followed his prescribed a course of medication, complied with a mental health counseling program, and moved back in with his mother. His progress over that two-year period was consistent and positive.[2] While under mental health court supervision, Chase was able to complete his AA degree, was able to maintain employment for longer periods of time, and he began to associate more with others. He even applied to the Washington Department of Health for a license as a chemical dependency counseling trainee in November 2017. Chase also formed an on-line relationship with a peer aged woman living in Mexico. He flew unaccompanied to Mexico to meet with her. Although the relationship did not last, based on Chase's progress, his mother believed she had her son back.

**Lacking a thorough understanding of his mental illness, Chase discontinued his medication and his life began to deteriorate:**

Believing he could function without medication, when the two-year Mental Health Court program ended, Chase stopped taking his medication.

Without his medication, Chase's mental health deteriorated. After a few months, he quit his job delivering flowers, suspecting he was being spied on and that government agents were involved in a plot to discredit him.

He found other employment delivering wine to large chain stores. His job required only superficial contact with other people.

---

[2] See, Exhibit 3, Certificate of Completion, King County Mental Health Court

DEFENDANT'S PRE-SENTENCE
REPORT -- 8

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

Needing a place to live, in 2018 Chase's mother purchased a condo in Kent. Chase moved in and began living alone.

Consistent with the progression of his mental illness, Chase began to interpret random acts (i.e. witnessing a low speed parking lot collision between two cars) as attempts on his life. A few weeks prior to his arrest in this case, he walked away from his job delivering wine.

Chase became convinced he was a "targeted individual," an informal label given to people by the government with "inside knowledge" about top secret programs like America's secret extra-terrestrial program and the location of secret Nazi research base underground in the mountains. He believed surveillance equipment had been secretly installed in his home.

One night, not long before his arrest, Chase's mother received a panicked phone call. Chase was out near JBLM with no recollection of how he'd gotten there. He concluded he'd been abducted, likely by aliens. Chase's mother was able to talk him down and he drove to his mother's house. She decided he should stay with her for a short period. Chase's mother took a week off of work to tend to her son and drove with him to Bellingham, thinking a change of scenery might stem the tide of his increasing delusions. One night Chase woke her up, handing her a note explaining something called the "crushing of ants" was starting tomorrow and they had to leave. Exhibit 4. Chase later explained that the "crushing of the ants" signified the extermination of significant portions of the world's population.

During the week Chase's mother spent with him, Chase slept only a few hours – during the entire week.

DEFENDANT'S PRE-SENTENCE
REPORT -- 9

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

By the time Chase returned to his condo, he was not working, he was living alone, and was socially isolated with no friends. He turned to the internet.

Like many people with paranoia, the internet was a trigger for Chase.

### Chase Begins Posting Irrational Statements, Memes and Emails on the Internet:

Chase's irrational posts included messages about Taylor Swift, a secret Nazi base on the moon, his belief that sitcoms were sending him messages, a description of how he was being attacked by Electromagnetic Frequency weapons, explanations about how Mossad agents had infiltrated his house and were attempting to frame him,[3] and even Chase speaking to "Islamist terrorists," where he'd wrapped his head in a towel and spoke in an imagined a foreign tongue.

Chase had a well-known national company perform a genetic profile.[4] Chase's profile established that he is, in fact, part Jewish. Chase had always admired his great-grandfathers, one of whom fought Nazi forces in Europe. Nonetheless, for the first time in his life, mirroring what he'd read and heard off of the internet, Chase began posting bilious information on his social media about hatred towards Jews and, as was a common internet theme in some of the fringe internet cites he was visiting, shooting up a Mosque.

### The Secret Service Observes Symptoms of Chase's Mental Illness, But Leaves After Receiving Chase's Assurance That He Will Stop Posting Threats:

[3] "This sneaky mossad agent has never been so serious about something as he is putting a bullet in Jared Kushner's brain. It must be done;" "I made a death threat against Jared Kushner yesterday and have not been arrested yet. Almost as though special forces murdering anyone who fucks with me or something. By the way, I do still plan on personally executing him ideally. Hi, mossad agent that steal phone."

[4] Because Chase concluded that his ancestry profile did not identify 100% of his genetic heritage, he concluded that the unaccounted for portion of his ancestry results from the fact that he is a descendant from an extra-terrestrial species located in the Zeta-Reticula star system.

DEFENDANT'S PRE-SENTENCE
REPORT -- 10

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

Count I of the Information limits the charging period for Chase's crimes from February 2019 to March 2019. On March 16, 2019, Chase's social media posts about J.K. and D.T., Jr. were brought to the attention of the FBI and U.S. Secret Service.

On March 19, 2019, in the company of Chase's mother, the Secret Service went to Chase's condo in Kent to speak with him. During that short contact, Secret Service Agent D. Robertson observed that Chase "presented behaviors and made statements that supported [Chase's paranoid schizophrenia diagnosis]." Special Agent Robertson noted that:

> When asked why he quit his job, Chase replied that he had been having trouble sleeping because of the "EM" weapon that the Mossad was using on him. The Mossad was trying to kill him and had poisoned him.

Rprt of USSS D. Robertson, File No. 127-671-0042546, entry of 03-19-2019.

Significantly, during that meeting Chase confirmed to the FBI and Secret Service that he had no intention of hurting anyone and that he did not own a firearm. He also confirmed he had no intent to travel to areas where either J.K. or D.T. Jr. might be found.

After assessing the situation, the Secret Service admonished Chase to stop posting threats against J.K. or D.T., Jr. on the Internet. When Chase agreed he would stop, the Secret Service and other law enforcement officers departed, leaving Chase in his condo.

The FBI began auditing Chase's social media. After being advised by the Secret Service that it was wrong to post about D.T., Jr. of J.K., the FBI confirmed Chase stopped posting about either man. However, having not been advised to cease them, his

DEFENDANT'S PRE-SENTENCE
REPORT -- 11

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

posts about Jews and bombing Synagogues continued. Report of USSS Agent Robertson, File 127-671-0042546, entry of 4/25/19.

In addition, LAPD advised the FBI that Chase was being investigated for cyber stalking D.K. and her employer, B.S., the individuals identified as the victims in Count II of the Information,

On April 25, 2019, the FBI received a notification that on April 3, 2019 Chase had attempted to purchase a pistol on-line.  Report, USSS Agent D.Robertson, File 127-671-0042546 entry of 4/29/19. On that date the Secret Service arrested Chase "based on his threats against Jews and synagogues." *Id.*

When Chase was arrested he didn't make hateful or angry pronouncements about the targets of his social media posts. Instead he continued to espouse delusional beliefs to the officer who arrested him about one of his primary interests, extra-terrestrials:

> I was instructed to transport Chase to the Federal Detention Center in SeaTac. During the drive Chase began to talk about aliens and how if I wanted to see them I needed to go to Mt. Adams where there were frequent sightings. Chase said I would need to use night vision goggles but they were provided at different locations there. He also informed me he had his own YouTube channel where he talks about this and has several videos of encounters with UFO's. Chase advised me he believes he was abducted by aliens a few months ago but did not feel comfortable telling me why he thought that. Prior to arriving at the Detention Center Chase said he had been diagnosed with Schizophrenia. I asked Chase if he took medication for it, he said he chose not to as the medication made him feel like he was dead.

Report of Kent P.D. Officer Jenifer Lundstrom, 5-1-2019, 10:50 hrs.

DEFENDANT'S PRE-SENTENCE
REPORT -- 12

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

### III.    APPLICABLE LAW[5]

The primary mandate in the U.S. Sentencing Guidelines provides that a sentencing court impose only the minimally sufficient sentence to achieve the traditional purposes of punishment – justice, deterrence, incapacitation and rehabilitation. U.S.S.G. §3553(a).[6]

Significantly, our courts have recognized that traditional sentencing purposes lose some of their relevance when applied to defendants who have a reduced ability to reason and control their impulses due to mental illness. *U.S. v. Cantu*, 12 F. 3d 1506, 1516 (9th Cir. 1993). Our courts have repeatedly acknowledged that the mentally ill are less deserving of punishment than those who act out of viciousness or greed. *Id;* also, *U.S. v. Ruklick*, 919 F. 2d 95, 97 (8th Cir. 1990) (defendant suffering from Schizoaffective disorder); *U.S. v. Merryweather,* 447 F.d 625 (9th Cir. 2006).

With that in mind, Mr. Colasurdo should receive the following downward departures to his sentencing:

---

[5] The Defense Memorandum as to why none of the upward adjustments advocated by the Government apply to Mr. Colasurdo has been separately briefed and filed. See, Defendant's Objections and Supporting Memorandum in Opposition to Proposed Upward Adjustments.

[6] Although *U.S. v. Booker*, 543 U.S. 220 (2005), made the U.S. Sentencing Guidelines advisory, the primary guideline sentencing mandates in section 3553(a) are still in effect.

DEFENDANT'S PRE-SENTENCE
REPORT -- 13

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

**A.      Mr. Colasurdo is entitled to a 3-level downward departure pursuant to U.S.S.G. §3E1.1 for his Acceptance of Responsibility.**

Mr. Colasurdo should receive a two-level downward departure for his clear acceptance of responsibility. U.S.S.G. §3E1.1(a); See, Plea Agreement, para. 9. Mr. Colasurdo admitted his unlawful conduct, expressed remorse for what he did, and has apologized.

In addition, Mr. Colasurdo should receive a one-point downward departure for his clear acceptance of responsibility. U.S.S.G. §3E1.1(b). Early on in the proceedings Mr. Colasurdo notified the assigned senior deputy U.S. Attorney of his intent to plead guilty. Consistent with that notification, Mr. Colasurdo waived Indictment, thereby saving the Government the time and expense of having to proceed via grand jury. His timely notification also allowed the Government to avoid preparing for trial and allowed both the Government and Court to efficiently allocate its resources elsewhere. Accordingly, Mr. Colasurdo should receive an additional one-point downward adjustment to his sentence. See, USSG §3E1.1(b) (Commentary, 2&6 - Timely notification to the government of intent to plead guilty); also see, Plea Agreement, para. 9.

DEFENDANT'S PRE-SENTENCE
REPORT -- 14

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

**B.   Mr. Colasurdo should receive an additional 2-level downward departure for his "extraordinary" acceptance of responsibility:**

Section U.S.S.G. 5K2.0 provides this Court with the discretion to depart downward if it determines the defendant's acceptance of responsibility was "extraordinary," even though his acceptance had already been considered under USSG §3E1. See, e.g. *U.S. v. Fagan*, 158 F.3d 1140 (10th Cir. 1998); see also, *U.S. v. Brown*, 985 F.2d 478, 482-83(9th Cir. 1993); *U.S. v. Miller*, 991 F.2d 552 (9th Cir. 1993). "Extraordinary acceptance of responsibility" can be a permissible factor for further departure beyond 3 levels commonly applied pursuant to USSG §3E.1.1 if it is present to a degree greater than that contemplated under the "heartland" of the guidelines. See, *Koon v. United States*, 518 U.S. 81, 98-100 (1996).

Here, in addition to accepting responsibility and providing early notification to the government of his intent to plead guilty, Mr. Colasurdo took additional affirmative action. Prior to even entering his guilty plea, Mr. Colasurdo signed a release that allowed the government unrestricted access to his electronic devices thereby sparing the Government and the Court the time, expense, and effort involved in requiring the Government to secure and execute a search warrant for those devices.

In addition, this case involves communications construed as threats to two public figures residing and working in California. Just prior to the Secret Service taking custody of Mr. Colasurdo, agents were was advised that Mr. Colasurdo was being investigated by law enforcement agencies in California. By entering his plea of guilty to Count II of the information, "the California cases," Mr. Colasurdo's allowed the Government to avoid

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1
2
the expense, time, and uncertainty involved in transporting Mr. Colasurdo to California and in litigating his guilt in two separate jurisdictions.

3
4
5
For his "extraordinary cooperation," Mr. Colasurdo should receive an additional two-level downward departure.

6
7
8
9
**C.      Mr. Colasurdo should be granted a downward departure pursuant to U.S.S.G. 5K2.13 because his offenses were committed while he was suffering from a "significantly reduced mental capacity."**

10
11
12
13
14
Mr. Colasurdo committed the offenses for which he is being sentenced while in "acutely psychotic...and his thoughts and actions were directly related to his decompensated psychiatric state." Psych. Eval. p. 12. As a result, Mr. Colasurdo's capacity to understand the wrongfulness of his behavior, and/or to exercise the power of reason, was significantly reduced.

15
16
17
18
Section U.S.S.G. §5K2.13,[7] provides for a downward departure if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense.[8]

19
20
[7] In addition, U.S.S.G.§5H1.3 Mental and Emotional Condition (Policy Statement) provides that, mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

21
22
23
[8] "Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong. U.S.S.G. 5K2.13, Application Note 1.

24
25
26
DEFENDANT'S PRE-SENTENCE REPORT -- 16

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

The goal of guideline §5K2.13 is lenity towards defendants whose ability to make reasoned decisions is impaired by illness. See, e.g. *U.S. v. Philibert*, 947 F. 2d 1467 (11th Cir. 1991) (U.S.S.G. §5K2.13 downward departure can be applied to delusional defendant who called victim's daughter and informed her he was coming to kill her father; Defendant who purchased $4,000.00 worth of weapons and ammunition); *U.S. v. Ruklick*, 919 F. 2d 95, 97, 99 ((8th Cir. 1990) (downward departure based on defendant's schizophrenia, affirming that defendant's mental illness need only be a "contributing cause," not a "but for" cause); *U.S. v. Cantu*, 12 F. 3d 1506, 1512 (9th Cir. 1993). (The criminal justice system has long meted out lower sentences to persons not in full command of their actions; defendant with PTSD); *U.S. v. Weddle*, 30 F. 3d 532, 540 (4th Cir. 1994) (defendant received §5K2.13 downward departure after conviction for violation of 18 USC §876 after mailing threats); *U.S. v. Glick*, 946 F. 2d 335, 338 (4th Cir. 1991) (departure from 30 months to probation where defendant's diminished capacity was a contributing factor, even if not the sole cause, of his criminal conduct); *U.S. v. Menyweather*, 447 F.d 625 (9th Cir. 2006) (defendant stole more than $400,000.00 over a period of years but, sentencing court's grant of an 8 -level downward departure resulting in sentence of 6 months was deemed reasonable because defendant's PTSD "distorted defendant's reasoning" and, "interfered with ability to make considered decisions"); *U.S. v. Malley*, 307 F. 3d. 1032, 1033-34 (9th Cir. 2002) (five-level downward departure was reasonable for defendant with diminished capacity); *U.S. v. Lewison*, 988 F. 2d 1005, 1007 (9th Cir. 2003) (four-level departure under §5K2.13 based on defendant's long-standing psychological problems); *Karis v. Calderone*, 283 F. 3d 1117, 1134 (9th Cir. 2002) (recognizing that defendants who commit criminal acts that

DEFENDANT'S PRE-SENTENCE
REPORT -- 17

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

are attributable to emotional or mental problems may be less culpable than those who don't suffer from mental illness).

That Mr. Colasurdo has a decade long history of being tortured by his severe mental illness is beyond dispute. His illness has resulted in job loss, social isolation and twice resulted in his being involuntarily committed to psychiatric facilities. Ex. I, Psych Eval. p. 4-5.

In addition, Mr. Colasurdo's conduct and statements to relatives and law enforcement officers, establish that he was acutely psychotic near and during the time period he was posting the on-line threats for which he is now being sentenced.

During the time period he was committing his crimes, Mr. Colasurdo's mother observed he was not sleeping, had lost a significant amount of weight, his personal hygiene was deteriorating, and that he was increasingly distressed about being followed and because he was convinced a mass extinction was coming. Ex. I, Psych. Eval. p.7. Mr. Colasurdo had begun regularly taking "evasive action" when driving, in order to evade persons who were following him. *Id*. He was convinced he was being poisoned. *Id.* He was sleeping on his floor instead of his bed because he thought he was going to be shot by a sniper. *Id.*

After interviewing Mr. Colasurdo, the U.S. Probation Officer assigned to his case accurately observed that, "[i]t appears that Mr. Colasurdo was in the midst of a month's long schizophrenic episode when he made the threats that led him [to this sentencing]." *Sentencing Recommendation*, U.S. Department of Probation.,p. 3.

DEFENDANT'S PRE-SENTENCE
REPORT -- 18

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

Similarly, forensic psychologist Dr. Brent Oneal concluded that, "at and near the time" of his crimes, Mr. Colasurdo was "acutely psychotic" and his "thoughts and actions were directly related to his decompensated psychiatric state." Psych. Eval. p. 12.

That Mr. Colasurdo was "suffering from a reduced mental capacity" while posting the on-line threats for which he was convicted, he is undisputed.

Once it is determined that a §5K2.13 departure is warranted, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. In 2015, when Mr. Colasurdo's mental illness was untreated, he was arrested and involuntarily committed to a psychiatric hospital. During the two years between 2015 and 2017, when Mr. Colasurdo was complying with his medication and counseling programs, he lived a law abiding and fairly productive life. From 2018 to his 2019 arrest, when Mr. Colasurdo's mental illness was again untreated, he drifted into a decompensated psychiatric state characterized by delusion and paranoia, that resulted in his committing the crimes for which he is being sentenced. Based on that four-year sample size, it is logical to conclude that, "but for" Mr. Colasurdo's untreated mental illness, the crimes he's been convicted of in this case likely would not have occurred at all.

Mr. Colasurdo's mental illness resulted in him having a "significantly reduced mental capacity" at the time of his crimes. Pursuant to U.S.S.G. §5K2.13, Mr. Colasurdo should receive a 6-level downward departure.

DEFENDANT'S PRE-SENTENCE
REPORT -- 19

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

**D.** **Mr. Colasurdo should receive an additional downward departures pursuant to U.S.S.G. § 5K2.0.**

Section U.S.S.G. §5K2.0(a)(1) provides the court with discretion to grant a downward departure "if there exists a mitigating circumstance of a kind, or to a degree, not adequately taken into consideration" by the Guidelines in order to advance the objectives set forth in 18 U.S.C. §3553(a)(2). Those objectives include, "promoting respect for the law," (18 U.S.C. §3553(a)(2)(A)), and, providing the defendant "with needed medical care, or other correctional treatment in the most effective manner." 18 U.S.C. §3553(a)(2)(D). The Court may also grant a downward departure based on "Multiple Circumstances" when "two or more offender characteristics taken together, make the case an exceptional one." U.S.S.G. § 5K2.0(c). See, e.g. *U.S. v. Lam*, 20 F.3d 999, 1003-005 (9th Cir. 1994) ("a number of convergent factors" supported conclusion that the defendant's criminal conduct was aberrant); *U.S. v. Coleman*, 188 F.3d 354, 360 (6th Cir.1999) (downward departure may be based on an aggregation of factors, each of which might in itself be insufficient to justify a departure); *In re Sealed Case*, 292 F.2d 913 (D.C. Cir. 2002).

1.     Mr. Colusurdo should receive a downward 2-level departure because of his high potential for mistreatment in prison.

This Court is not limited to sentencing a defendant based solely upon characteristics directly related to the crime committed. E.g. *U.S. v. Lara*, 905 F.2d 599,

DEFENDANT'S PRE-SENTENCE
REPORT -- 20

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

605 (2d Cir. 1990) (downward departure from 10 to 5 years upheld because defendant's bisexuality and youthful appearance made him "particularly vulnerable to prison victimization," a factor "not adequately considered by guidelines"); *U.S. v. Gonzalez*, 945 F.2d 525 (2d Cir. 1991) (downward departure affirmed where defendant's appearance made him likely victim from other prisoners).

Here, it is undisputed that Mr. Colasurdo suffers from a serious mental illness that has, in essence, tortured him, causing him to interpret even the most common events as an indication that an attempt will be made on his life, rendering him unable to eat for fear his food has been poisoned and unable to sleep in a bed for fear he will be the victim of a sniper. Unfortunately, as an individual suffering from serious mental illness, the odds are high that in federal prison, Mr. Colasurdo's stay will be especially harsh and he will not receive anything close to appropriate mental health care.[9] Mr. Colasurdo's significant mental illness is a characteristic distinguishing his case from the typical cases covered by the guidelines. His extraordinary psychiatric impairment reason for the Court to grant him a 2-level downward departure.

2.  <u>Mr. Colasurdo should receive a downward departure because he has established that when he is receiving mental health treatment, incarceration is unnecessary.</u>

Mr. Colasurdo's history has established that, with medication and even moderate guidance from trained professionals, his mental illness can be managed, and he can live a productive life as a law-abiding member of a community.

---

[9] S e e ,   e . g . , *Treatment Denied: The Mental Health Crisis in Federal prisons.* https://www.themarshallproject.org/2018/11/12treatment-denied-the-mental-health-crisis-in-federal-prisons; and see, *Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness*" https://oig.justice.gov/reports/2017/el705.pdf (discussing how BOP mentally ill offenders are improperly left in solitary for extended periods, how the BOP does not have adequate policies in place to address needs of inmates with mental illness, etc.)

DEFENDANT'S PRE-SENTENCE
REPORT -- 21

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

The U.S. probation officer who interviewed Mr. Colasurdo has stated:

He has shown an ability to be successful when monitored, attending treatment, and on appropriate medication. Mr. Colasurdo is clearly very bright and while he was in Mental Health Court, he was able to complete an associate's degree and lead a stable life. However, when his mental illness and paranoia take hold, he becomes a very troubled individual, participating in behavior that led to this sentencing...When closely monitored, attending treatment, and learning tools to change his thinking patterns, Mr. Colasurdo will be better able to control and manage his mental illness and behavior.

*Sentence Recommendation*, U.S. Probation, p.6.

In addition, Dr. Oneal concluded after evaluating Mr. Colasurrdo that, "It is clear that he is able to do quite well when medicated, treated, and closely monitored" Psych Eval. p13.

Section 18 U.S.C. §3553(a) states that a sentencing court "shall impose a sentence sufficient, but not greater than necessary, to comply" with the purposes set forth in §3553(a)(2). Those purposes, none of which is given a greater importance than the other, include providing a "just punishment" for the offense (2)(A) and providing the defendant with needed medical or correctional treatment. (2)(D)[10]

Mr. Colasurdo's history and the opinions of both U.S. Probation and a forensic psychologist concur that when Mr. Colasurdo's mental illness is managed, he can live fairly productively in the community. Sentencing a mentally ill offender to a lengthy

---

[10] Although those purposes include deterrence to criminal conduct, our courts have repeatedly and clearly stated that deterrence has a reduced purpose when the defendant suffers from mental illness. *U.S. v. Cantu*, 12 F. 3d 1506, 1512-16 (9th Cir. 1993); *U.S. v. Menyweather*, 447 F.d 625 (9th Cir. 2006).

DEFENDANT'S PRE-SENTENCE
REPORT -- 22

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

period of incarceration when there is no dispute that when his mental illness is treated there will be little likelihood he will offend, conflicts with the mandates of 18 U.S.C. §3553(a) listed above. For that reason, Mr. Colasurdo should receive an additional 2-level downward departure.

**E.      The defense conditionally requests that Mr. Colasurdo be sentenced to a period of five years of community supervision, rather than the 3-year period contemplated by the applicable statute.**

As noted by both U.S. Probation and Dr. Oneal, Mr. Colasurdo has established that, when complying with his medication regime, he can live a productive and law-abiding life.

Pursuant to U.S.S.G. §5D1.2, this Court has the general authority in certain circumstances to "extend a term of supervised release." U.S.S.G. §5D1.2 Application Note 5.; see also, 18 U.S.C. §3583(a),18 U.S.C. §3583(e)(1)(2). Further, 18 U.S.C. §3563(b)(9), provides that the court may, as part of the community supervision portion of a sentence, order that a defendant "undergo available medical, psychiatric, or psychological treatment, as specified by the court." 18 U.S.C. § 3563(b)(9). Concurrently, there also is authority for the Court to depart from the guidelines based upon agreement of the parties. See, U.S.S.G. §5K2.0.3(a)(5) (departures agreed to in plea agreements).[11] Finally, as noted above, §5K2.0(a)(1) provides the court with discretion to

---

[11] Here, U.S. Probation has already stated that if the legal authority exists, U.S. Probation would not object to an increased period of community supervision. *Addendum to the Pre-Sentence Report*, Response to Objection 18.

DEFENDANT'S PRE-SENTENCE
REPORT -- 23

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

grant a downward departure a sufficient mitigating circumstance exists which hasn't been sufficiently recognized. Mr. Colasurdo's mental illness falls within that category.

Because a fundamental tenet of sentencing is for the Court to impose sentence only that sentence "sufficient but not greater than that" necessary to comply with the fundamental purposes behind sentencing, this Court should grant Mr. Colasurdo a sentencing departure by sentencing Mr. Colasurdo in accord with his base offense level of 12, to be followed by a period of 60 months of supervision in the community rather than the 36 months supervision generally authorized by statute.

### IV.   CONCLUSION

Through denial of the upward adjustments advocated by the Government, and/or application of the downward departures advocated by Mr. Colasurdo, this Court should sentence Mr. Colasurdo to a period of incarceration between 10 – 16 months, to be followed by a period of 60 months of community supervision. That sentence is appropriate in consideration of his severe psychiatric impairment and the purposes behind sentencing as stated in 18 U.S.C. §3553(a).

DATED this 11th day of October, 2019.


Eric Lindell
Eric W. Lindell
Attorney for Defendant
Lindell Law Offices, PLLC
P.O. Box 379
Redmond, WA  98073
(206) 230-4922
Eric@Lindelllaw.com

DEFENDANT'S PRE-SENTENCE
REPORT -- 24

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following:

Todd Greenberg
Assistant United States Attorney


s/Eric W. Lindell
Attorney for Defendant
Lindell Law Offices, PLLC
P.O. Box 379
Redmond, WA  98073
(206) 230-4922
Eric@Lindelllaw.com

DEFENDANT'S PRE-SENTENCE
REPORT -- 25

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

8

UNITED STATES OF AMERICA,                  )   NO. MJ19-190
                                           )   Docket No. 2:19CR00097RSM-001
            Plaintiff,                     )
                                           )   DEFENDANT'S OBJECTIONS AND
      vs.                                  )   SUPPORTING MEMORANDUM IN
                                           )   OPPOSITION TO PROPOSED
CHASE COLASURDO,                           )   UPWARD ADJUSTMENTS
                                           )
            Defendant.                     )
                                           )
_____)

## I.    INTRODUCTION[1]

The defendant, Chase Colasurdo, is before the Court for sentencing on two counts of Interstate Threats, 18 U.S.C. §875(c).

Mr. Colasurdo is 27 years old. "The defining characteristic of Mr. Colasurdo's adult life has been his mental illness."[2] Twice in the past nine years he has been involuntarily committed to psychiatric hospitals. The crimes for which Mr. Colasurdo is being sentenced were a direct result of his mental illness. Mr. Colasurdo has

---

[1] Defense counsel provided written notice of these objections to the Sr. Deputy AUSA and the U.S. Probation officer assigned to Mr. Colasurdo's case on August 5, 2019.

[2] *Sentencing Recommendation*, Dept. of U.S. Probation, Whalley, p.3, (2019).

DEFENDANT'S OBJECTIONS -- 1

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA 98073
206-230-4922

established that, with a regime of counseling and medication, his mental illness can be managed, he can remain crime free, and can live a productive life.[3]

## II.    APPLICABLE FACTS

Mr. Colasurdo suffers from Paranoid Schizophrenia. His mental illness and concomitant delusional belief that family, friends, co-workers, and various government entities are plotting against him, has interfered with his ability to maintain long-term employment, prohibited him from entering into meaningful relationships, led to his alienation from one-time friends and acquaintances, and resulted in his living in almost complete social isolation to the point where, at the time of his crimes, his primary contact with the outside world was through the internet.

By contrast, during the two-year period between 2015 and 2017, when Mr. Colasurdo was participating in King County Mental Health Court, he attended weekly counseling sessions, complied with his required medication regime, was able to maintain steady employment, completed his A.A. degree at Bellevue College, and fostered relationships with others.

Unfortunately, just prior to successfully completing the two-year mental health court program, Mr. Colasurdo received permission to gradually reduce his anti-psychotic medication. When his supervision period ended, believing he had overcome his illness, he stopped taking his medications and failed to seek out additional mental health counseling. His mental state began deteriorating at that time.

By early 2019, his untreated delusions had begun to dominate his life. After concluding that his employer and customers were conspiring to kill him, Mr. Colasurdo walked away from his job delivering wine to large chain stores. He began to spend his

---

[3] *Id*, p.6

DEFENDANT'S OBJECTIONS -- 2

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1  days and nights on the internet and social media sites, posting irrational and often

2  disturbing statements which he then sent to news media and to the public figures

3  themselves. The individuals identified in Counts I and II of the Information were targets

4  of Mr. Colasurdo's bizarre social media deluge.

5       In March of 2019, Mr. Colasurdo's irrational and often angry internet posts came

6  to the attention of law enforcement agencies. On March 19, 2019, the FBI and the

7  Secret Service, in the company of Mr. Colasurdo's mother, visited Mr. Colasurdo at his

8  residence. During that short interaction, Mr. Colasurdo told Secret Service officers how

9  the Israeli intelligence agency, Mossad, were after him, he talked about extra-terrestrials

10 living among us, and he explained that his brain was being targeted by Electro-

11 Magnetic Pulse weapons.

12      Federal agents instructed Mr. Colasurdo to stop posting internet threats to, or

13 about, persons under Secret Service protections (*e.g.,* J.K. and D.T. Jr., identified as

14 victims in Count I were Secret Service protectees). After Mr. Colasurdo agreed, the FBI

15 and Secret Service ended their visit with Mr. Colasurdo and left.

16      Mr. Colasurdo, having been informed that he had to cease social media and

17 emails directed to, or concerning, Secret Service protectees, was able to comply with

18 that direction[4]. However, Mr. Colasurdo sent social media in various forms to

19 conservative political commentator D.K., a young woman with whom he'd become

20 infatuated, and her boss, B.S. Both D.K. and B.S. are identified as the victims in Count

21 II of the Information. In addition, for weeks, Mr. Colasurdo had been making irrational

22

23

24  ―――――――――――――――
    [4] 04-25-19 entry of USSS Agent D.R., File: 127-671-0042546

25

26  DEFENDANT'S OBJECTIONS -- 3

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

anti-Semitic comments advocating that Synagogues be bombed.[5] Mr. Colasurdo was not charged and did not enter pleas relating to his advocating violence against Synagogues.

In early April, while monitoring Mr. Colasurdo's on-line presence, the FBI observed that he'd attempted to make an on-line purchase of a handgun from a major sporting goods chain. In response, on April 25, 2019, the Secret Service arrested Mr. Colasurdo "based on his threats against Jews and synagogues."[6]

While being transported to federal detention following his arrest, Mr. Colasurdo did not claim to be angry or intent on harming any of the individuals named on Count I or II. He never mentioned them. Instead he informed his transporting officer that extra-terrestrial were active in the Mount Adams area, explaining that they could be seen with night vision goggles, adding that he already had his own night vision goggles.

A.   The U.S. Probation Interview of Mr. Colasurdo: The U.S. Probation Officer, prior to commencing with the probation interview of Mr. Colasurdo, advised she would not be asking him about the facts upon which his convictions were based. Consistent with that announcement, during the probation interview Mr. Colasurdo was not asked a single question about his specific motives or intent behind his irrational internet posts. (Admittedly, after Mr. Colasurdo advised the U.S. Probation Officer of some of the complicated steps he'd had to take to protect himself from attacks he believed were pending, described how he'd been taken captive by extraterrestrials, and explained how he'd had to purchase a device that warned him when he was being

_____

[5] Mr. Colasurdo is not charged regarding threats to Synagogues. His numerous anti-Semitic posts were a response to his delusional belief that The Mossad was after him. The irrationality of his anti-Jewish posts become even more evident considering the fact that Mr. Colasurdo's was aware at the time of his posts that he is actually of Jewish ancestry.

[6] See, 4-29-19 entry of USSS Agent D.R., File: 127-671-0042546.

DEFENDANT'S OBJECTIONS -- 4

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

attacked by EMP weapons, the motivation behind Mr. Colasurdo's internet postings was fairly obvious. See, *Sentencing Recommendation*, Dept. of U.S. Probation, Whalley, p.3, (2019)).

    B.    <u>2019 Forensic Psychological Evaluation of Mr. Colasurdo</u>[7]

Dr. B.J. Oneal, a forensic psychologist, concluded that, in the weeks preceding and during the time period Mr. Colasurdo was sending out his interstate threats, he was "acutely psychotic" and, "his thoughts and actions were directly related to his decompensated psychiatric state.[8]

Further, unlike U.S. Probation, Dr. Oneal spent a significant amount of time both reviewing records of Mr. Colasurdo's mental health history and asking him directly what his motivations were in making his on-line threats. [9]

### III.    <u>APPLICABLE LAW</u>

**A.    Mr. Colasurdo's mental illness is a factor that must be considered when imposing sentence in this case.**

Section 18 U.S.C. §3553(a) limits a sentencing court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553(a)(1). Those purposes include imposition of a sentence that "...promotes respect for the law,...affords adequate deterrence,...and provides the defendant with

---

[7] Hereinafter, "Psych Eval."

[8] Psych Eval., p. 12.

[9] Psych Eval., p. 6-8.

DEFENDANT'S OBJECTIONS -- 5

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1  needed...training, medical care, or other correctional treatment in the most effective

2  manner." 18 U.S.C. § 3553(a)(2).

3       Our courts have recognized that traditional sentencing motivations, such as

4  deterrence and blameworthiness, lose some of their relevance when applied to

5  defendants who have a reduced ability to reason and control their impulses due to

6  mental illness. *U.S. v. Cantu*, 12 F. 3d 1506, 1516 (9th Cir. 1993); *U.S. v. Ruklick*, 919 F.

7  2d 95, 97 (8th Cir. 1990); *U.S. v. Merryweather*, 447 F.d 625 (9th Cir. 2006).

8       Consistent with those principles and the facts of this case,  Mr. Colasurdo 's

9  "acute psychosis" at the time of his crimes rendered him unable to form the specific

10 intent required to support the upward adjustments proposed by the Government and, as

11 detailed below, those adjustments should not be applied to his sentencing. See, *U.S. v.*

12 *Christian*, 749 F. 3d 806, 809 (2014) (diminished capacity allows a defendant to argue

13 he/she did not have the specific intent to make a threat); see, also, 18 U.S.C. §17.

**B.      Mr. Colasurdo's Base Offense Level is 12 and the Government bears the burden of proving their upward adjustments by clear and convincing evidence:**

     The parties agree that, pursuant to USSG §2A6.1(a)(1), Mr. Colasurdo's base

offense level is a 12 leaving him with a sentencing range of 10-16 months.

     The U.S. Attorney provided notice in Mr. Colasurdo's plea agreement that it may

seek upward adjustments but, at the time of this writing, has not provided a specific

explanation in support of those proposed adjustments. However,. application of those

upward adjustments, as argued by U.S. Probation in their Pre-Sentence Investigation

DEFENDANT'S OBJECTIONS -- 6

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1  Report, would result in more than doubling Mr. Colasurdo's offense level to 25 and

2  would increase his standard range from 10 to 16 months to 57-71 months.

3       Generally speaking, when the Government seeks an upward adjustment of the

4  offense level, it bears the burden of proving the facts supporting that adjustment by a

5  preponderance of the evidence.. *McMillan v. Pennsylvania,* 477 U.S. 79, 91-92 (1986);

6

7  *United States v. Fernandez-Vidana,* 857 F. 2d 673, 675 (9th Cir. 1988)); *United States v.*

8  *Lora-Andres,* 844 F.3d 781, 785 (8th Cir. 2016). However, when, as in this case, the

9  application of upward adjustments would result in an extremely disproportionate

10  sentence, due process mandates that a sentencing court require "clear and convincing"

11  proof as a precursor to applying those adjustments. *U.S. v. Gardenshire,*784 F.3d

12  1277,1280  (2015)(clear and convincing standard appropriate when Government's

13  adjustments doubled defendant's offense level); *U.S. v. Staten,* 466 F. 3d 708, 717-718

14  (2006)(clear and convincing standard applied in case where adjustment increased the

15

16  defendant's offense level by fifteen levels and more than doubled his sentence).

17       **C.     The Government cannot meet their burden of proving Mr.**
         **Colasurdo's conduct "evidenced the intent" to carry out a true**
18       **threat  to J.K., D.T. Jr, D.K. or B.S.**

19

20       Section USSG §2A6.1(b)(1) provides that a six-level upward adjustment may be

21  imposed "[i]f the offense involved any conduct evidencing an intent to carry out such

22  threat." Application of this enhancement turns on whether the Government can meet its

23  burden of proving that the defendant engaged in an overt act that demonstrates his

24  specific intent to carry out *the threat for which the defendant was convicted.* See. e.g.

25

26  DEFENDANT'S OBJECTIONS -- 7

*U.S. v. Spangle*, 281 Fed. Appx. 693 (9th 2008)(emphasis added); also, *U.S. v. Goynes*, 175 F. 3d, 350,355 (5th Cir. 1999)(requiring an "overt act" to sustain an enhancement under USSG §2A6.1(b)(1)). In other words, it is insufficient to prove the defendant's conduct evidenced an intent to act on either a "general threat," or a specific threat for which he has not been convicted.

Here, Mr. Colasurdo was convicted of making Interstate Threats in Count I to J.K and D.T. Jr. and in Count II, of making Interstate Threats to K.D. and B.S.

The Government, as of this writing, has not specifically identified the "overt act" they are relying on to meet their burden of proving this enhancement. The U.S. Probation identifies Mr. Colasurdo's April 2019 attempt to purchase a handgun on-line as "the overt act" that proves his intent to carry out interstate threats against J.K., D.T. Jr., K.D, and B.S. Proper application of this adjustment would therefore require the Government prove that Mr. Colasurdo's purpose in attempting to purchase that handgun was to carry out the threats for which he was convicted, (as opposed to some other reason, or, even to carry out some other threat for which he was not convicted). See, USSG §2A6.1(b)(1); *U.S. v. Spangle*, 281 Fed. Appx. 693 (9th 2008). Because the Government cannot meet their burden in this case, it would be improper to apply this 6-level upward adjustment.

First, as Mr. Colasurdo's mother will affirm, he has had an interest in firearms since he was a boy and has periodically owned firearms since 2009. His 2019 attempt to purchase a firearm from a sporting goods store was nothing new or unusual.

DEFENDANT'S OBJECTIONS -- 8

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

Second, during his March 19, 2019 interview with Secret Service, Mr. Colasurdo clearly stated that he had no intention of hurting anyone. He also confirmed that he had not previously traveled to any location where any of the persons named in the Count I or II might be found and that he did not intend to travel to any such location.

Third, in Mr. Colasurdo's posts, which form the basis for his crimes, he made statements indicating he had no intent to harm anyone. (i.e., "Woah! I just got visited by the secret service looks like my account got hacked! I am definitely changing my password. *I have no plans of illegal activity!*"). Some of this posts also included a disclaimer, describing his statements as being, "autistic *fiction*," and declaring that he was, "desperately seeking gf, *all posts are satire*." In an email to the Huffington Post MSNBC he plainly stated, "I am not saying this is a threat." Describing his posts as, "fiction," and "satire" and his stating, "I have no plans of illegal activity" is the opposite of what is needed to prove an intent to carry out the threats for which Mr. Colasurdo was convicted.

Fourth, during the month after Mr. Colasurdo had been informed by the Secret Service to cease any on-line harassment of Secret Service protectees, the FBI, which was monitoring his social media posts, confirmed that Mr. Colasurdo did in fact stop; an indication that he lacked intent to carry out his on-line threats.[10]

---

[10] In fact, as the 4-29-2019 entry of the report of USSS Agent D.R., specifically provides, the Secret Service arrested Mr. Colasurdo not for threatening the individuals charged in Counts I and II in this case, but instead, "based on his threats against Jews and synagogues."

DEFENDANT'S OBJECTIONS -- 9

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

Fifth, immediately following his arrest, Mr. Colasurdo did not evidence any anger or hostility towards the targets of his irrational, on-line posting. Instead he talked about how he could see extra-terrestrials in the Mount Adams area but using his night vision goggles.[11]

Finally, Mr. Colasurdo suffers from a serious, although manageable, mental illness.

During his psychological evaluation, Dr. Oneal asked Mr. Colasurdo specifically about this thought process and intent during the period he was making the on-line threats that form the basis for his convictions. For example:[12]

| | |
|---|---|
| *Colasurdo*: | Then after the vacation I sort of calmed down a little bit but I continued to find all these things on the internet about conspiracies; alien coverups and connections of Israelis to a lot of these. Like all of their nefarious activities. So I was trying to gain attention for my videos on those subjects. |
| *Dr.*: | Were you making or finding videos? |
| *Colasurdo*: | Both. I then started sending this information to the media... I would say this is from Russia; I was trying to do anything to get their attention. |
| *Dr.*: | Why were you making death threats? |
| Colasurdo: | I got death threats and was trying to get media attention so I basically thought I would make a fake one in return. |
| *Dr.*: | Did you have a plan to harm anyone? |
| *Colasurdo:* | No. |

---

[11] See, Report of Kent P.D. Officer Jenifer Lundstrom, Case No. 19-6050, 5-1-2019, 10:50 hrs.

[12] See, Psych. Eval., p.7.

DEFENDANT'S OBJECTIONS -- 10

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

| | | |
|---|---|---|
| *Dr.:* | How about your purchases back then? |
| *Colasurdo*: | I basically thought the Apocalypse was coming so I purchased a bunch of survivalist stuff and body armor. I also felt threatened. I bought a security camera and I tried to buy a handgun for the Apocalypse and self-defense...I forgot to say that during that period I felt I was under psychic attack. I read about electronic attack so I bought an EMF [Electro-Magnetic Frequency Detector] from Amazon and it was beeping. I thought there was an EMF weapon or an extradimensional activity. |

In addition, in the weeks prior to his arrest, Mr. Colasurdo confirmed to his mother that he was preparing for what he believed was a coming Apocalypse, (which he earlier described as "The Crushing of the Ants.") See, Psych Eval., p. 6. His preparation included storing up copious amounts of pasta sauce and other foods and she recalled seeing survival manuals around the condo where Mr. Colasurdo lived. *Id.* Mr. Colasurdo's mother also reported that he spoke to her about having to "gear up" for the coming Armageddon. *Id.*

The following illustrate some of Mr. Colasurdo's beliefs immediately prior to, and during the period covering the charged crimes:

- That his life was in constant danger of attack;

- That he had been taken captive by extraterrestrials;

- That Nazi's had a secret research facility inside a mountain in Europe;

- That he was being targeted by an EMP weapon;

DEFENDANT'S OBJECTIONS -- 11

- That his food and drink were being poisoned, causing him to stop eating to the point he lost 15-20 pounds over a period of weeks;

- That an automobile accident he witnessed was actually an unsuccessful attempt on his life;

- That a car following him used a flashing light device which caused him to "lose time" for 45 minutes, during which he was somehow transported 30 miles away to an area near JBLM;

- That an event he named the "Crushing of the Ants" was imminent and that when it occurred large segments of the population will be killed;

- That an enemy was going to destroy the world's power grid.

Mr. Colasurdo's delusional beliefs have caused him to taken a number of steps:

- He attempted to hone his self-defense skills by working out an MMA gym.

- He purchased books on gathering his own food and living without power.

- He purchased jars and jars of vitamin supplements EXHIBIT.

- He purchased and stored voluminous amounts of non-perishable food, such as spaghetti sauce.

- He purchased bullet proof body armor and a large store of ammunition.

- He bought an anti-EMF detection device so he would know when his enemies were using Electromagnetic Pulse weapons on his brain.

- He purchased night vision goggles (in order to see the extra-terrestrials);

and, ultimately, as he had done on prior occasions in his life, he attempted to purchase a handgun on-line from a large sporting goods chain.

DEFENDANT'S OBJECTIONS -- 12

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1        In order for this court to apply this upward adjustment, the Government must

2   prove by clear and convincing evidence that Mr. Colasurdo's subjective intent in

3   attempting to purchase a handgun in April 2019 was specifically for the purpose of

4   carrying out the threats for which he was convicted - as opposed to being connected his

5   mental illness and/or his irrational but sincere belief that his life was in danger. See,

6   *U.S. v. Philibert*, 947 F. 2d 1467 (11th Cir. 1991)(Court determined that application of

7   upward adjustment under USSG §2A6.1(b)(1) was improper because evidence

8   defendant purchased a handgun and ammunition did not constitute proof of defendant's

9   intent to carry out threats as opposed to simply being "additional evidence of

10  [defendant's] paranoid schizophrenia.");  *U.S. v. Scott*, 441 F. 3d 1322 (9th Cir. 2006);

11  *U.S. v. Leaming*, 596 Fed. Appx 535, 537 (9th 2015).

12       Because the U.S. Attorney has not proven that Mr. Colasurdo's subjective intent

13  in attempting to purchase a handgun was specifically for the purpose of carrying out

14  threats to J.K., D.T. Jr., D.K. and B.S., as opposed to being just "additional evidence of

15  his paranoid schizophrenia" - like his purchases of an EMF weapon detector, night

16  vision goggles to see extraterrestrials, and his stockpiling of non-perishable food items

17  had been – the evidence is insufficient for this court to apply 6-level upward adjustment

18  based on USSG §2A6.1(b)(1).

DEFENDANT'S OBJECTIONS -- 13

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

**D.      The U.S. Attorney has not met its burden of proof that Mr. Colasurdo's threats to J.K and D.T. Jr. were specifically "motivated" by their status as politicians:**

The upward adjustment in section 3A1.2(a) only applies "If the victim was a government officer or employee, … or member of the immediate family of any of the above, *and the offense of conviction was motivated by such status.*" U.S.S.G. §3A1.2(a) (emphasis added).

Application Note 3, to the commentary to U.S.S.G. §3A1.2(a), explains

> "motivated by such status", for purposes of subsections (a) and (b) means that the offense of conviction was motivated by the fact that the victim was a government officer or employee, or a member of the immediate family thereof. This adjustment would not apply, for example, where both the defendant and victim were employed by the same government agency and the offense was motivated by a personal dispute.

As the Commentary to U.S.S.G. §3A1.2(a), makes clear, application of this 6-level adjustment requires something more than a defendant who is aware that his/her victim is a federal employee or a relative of a federal employee. Instead, the Government must prove by clear and convincing evidence that the reason for the threat was motivated by something more than the fact that the target of the threat was employed by the government. See, *United States v. Woody*, 55 F.3d 1257, 1274 (7th Cir.1995) (U.S.S.G. §3A1.2 "requires a higher level of culpability.")

Mr. Colasurdo has a decade long history of suffering from a serious mental illness. At the time he was sending and posting irrational statements on the internet, he

DEFENDANT'S OBJECTIONS -- 14

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

was off his medication, and was in "acute psychosis." (Psych. Eval., p. 12) and appeared to be "in the midst of a months long schizophrenic episode...". *Sentencing Recommendation*, U.S. Probation, p.3.

Mr. Colasurdo did not make any threats disclosed to the defense that prove his derogatory comments about D.T. Jr. were made *because of* D.T. Jr.'s status as a relative of a politician. For example, commenting on one photograph of D.T. Jr., Mr. Colasurdo states, "My great-grandfather would have executed him (D.T. Jr.) just for his haircut." Instead, Mr. Colasurdo has explained that his threats were (irrationally) intended to draw attention to the fact that he himself had had his life threatened. To that end he reasoned that by sending copies of his threats to numerous national news agencies, he could get the media to pay attention to what was really going on. Psych Eval. p. 7.

As to J.K., Mr. Colasurdo makes no mention of J.K. being responsible for any legislation that negatively affected Mr. Colasurdo or that Mr. Colasurdo disagreed with. For example, Mr. Colasurdo posts an image of J.K. with a (air-soft) gun pointed at a photograph of J.K. with the caption, "Mossad can sneak in your house and take a picture." A reasonable interpretation of the caption, is that Mr. Colasurdo is saying a Mossad agent snuck into his house and took the picture. (persecution by the Mossad is a theme repeated by Mr. Colasurdo) In addition, Mr. Colasurdo has also stated that his negative feelings about J.K. were based on his belief that J.K.'s father was involved in the 2008 Jeffery Epstein plea deal, a plea deal which has been often criticized in the

DEFENDANT'S OBJECTIONS -- 15

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1   media as representing a dishonest perversion of the criminal justice system. See, Psych.

2   Eval. p. 7."[13]

3
4   The Government has not proven by clear and convincing evidence that Mr.

5   Colasurdo was motivated to make a "true threat" directed at J.K. because of something

6   J.K. did as a politician. The 6-level adjustment discussed in U.S.S.G. §3A1.2(a) is not

7   satisfied merely because the person threatened is a government official. The facts of this

8   case are insufficient to satisfy this upward adjustment.

9       **E.      Mr. Colasurdo's irrational and threatening statements to J.K., D.T.**
10              **Jr., D.K. and B.S. which included derogatory statements about**
                **"Jews" were the result of Mr. Colasurdo's delusions, and the**
11              **complainants were not intentionally selected because of their**
                **religion. §3A1.1(a).**
12
13      Before a 3-level upward adjustment pursuant to U.S.S.G. §3A1.1(a) can be

14   applied in this case, the Government must prove beyond a reasonable doubt that Mr.

15   Colasurdo intentionally targeted the individuals named in Counts II because of their

16   Jewish faith.[14]

17      The U.S. Probation representative has already concluded that Mr. Colasurdo's

18   threatening statements towards J.K. and D.T., Jr. were not motivated by their religion
19

20   ―――――――――――――
    [13] The *Sentencing Recommendation* of U.S. Probation advises that Mr. Colasurdo "gloated" that he 'made
21   a death threat' against J.K. and had not been arrested yet." *Sentencing Recommendation*, p. 3. However,
     that full post states, "Weird...I made a death threat against Jared Kushner yesterday and I have not been
22   arrested yet. Almost like I have special forces murdering anyone trying to f**k with me or something."
     Instagram Post 7:08 a.m. When the full text of the post is read, it establishes he is not "gloating" but again
     delusional, believing a "special force:' was protecting him from arrest.

23   [14] Application of U.S.S.G. §3A1.1(a) requires proof that the defendant made his/her threats to the victims
24   because of their religion. Making a general threat to destroy a Synagogue is not a "true threat" to either
     D.K. and B.S. and would therefore be insufficient to apply this adjustment.
25

26   DEFENDANT'S OBJECTIONS -- 16

                                    LINDELL LAW OFFICES, PLLC
                                            P.O. Box 379
                                         Redmond, WA 98073
                                           206-230-4922

and therefore the U.S.S.G. §3A1.1(a) upward adjustment should not be applied in Count I. See, *Addendum to Pre-sentence Report*, U.S. Probation, Objection No. 18.

Although Mr. Colasurdo has had a long-time interest in World War II, until making the plethora of irrational on-line threats and statements he made in the weeks prior to his arrest, Mr. Colasurdo had never expressed pro-Nazi sentiments nor made derogatory statements about the Jewish religion. In fact, as Mr. Colasurdo's mother confirmed, one of his "heroes" is his maternal great-grandfather who fought against the Nazi's in Europe in World War II when they were persecuting Jews.

In addition, Mr. Colasurdo was aware at the time he was posting irrational anti-Semitic threats, that he was actually part Jewish.

Further, as Mr. Colasurdo alluded during his March 2019 interview with Secret Service, a significant part of the reason behind his anti-Semitic posts stemmed from the fact that he believed the Mossad, an Israeli Government intelligence agency, was trying to kill him.[15]

Finally, part of Mr. Colasurdo's recent fascination with Nazis stems from the fact that he believes that after WWII, the Nazis established a base on the dark side of the moon. See, e.g. Colasurdo's post of 02/05/2019 ("And by Russia I mean space Nazis").[16]

---

[15] e.g. Mr. Colasurdo's post,"Jews will try to subliminally frame Chase by blowing up a bus of Italian children. I could have prevented it, but I am writing articles and touring colleges, I am so smart and on TV, unlike Chase."

[16] The internet, where Mr. Colasurdo spent countless hours prior to his arrest, offers support for any irrational idea the socially isolated might have. See, e.g. *Why Are We Still Obsessed With The Idea Of Nazi's On The Moon.* .https://www.telegraph.co.uk/tv/0/still-obsessed-idea-nazis-moon/

DEFENDANT'S OBJECTIONS -- 17

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

Furthermore, based on the repeated theme and tone of his posts to K.D. that Mr. Colasurdo was infatuated with her and was much more intent on initiating a sexual relationship with her than in doing her harm.[17] Accordingly, it appears just as likely that the irrational comments Mr. Colasurdo's directed towards B.S. stemmed from the fact he perceived B.S. had a relationship with K.D. that Mr. Colasurdo wanted.

The Government cannot prove beyond a reasonable doubt that Mr. Colasurdo's threats towards D.K and B.S. were made because of their religion. Accordingly, it would be improper to apply an upward adjustment based on U.S.S.G. §3A1.1(a).

## IV.   CONCLUSION

The Government has not met their burden of proving Mr. Colasurdo's pre-arrest attempt at purchasing a firearm was specifically intended to carry out a threat to the individuals listed in Counts I or II, as opposed to being the actions of a man in the throes of a psychotic state who purchased an EMF detector from Amazon, night vision goggle to spot alien beings, and who believed an Armageddon like event was forthcoming. Accordingly, it would be improper for this Court to apply a 6-level upward adjustment based on USSG §2A6.1(b)(1).

---

[17]Feb 14, 2019 12:49 "Happy Valentine's my love and future sex slave (hopefully):)Everyone wants to use me...I just want a GF...I will not negotiate with terrorists.";  "MMA player desperately seeking **gf,** genetically engineered, family is master Chief, I have been hacked...posts are autistic fiction, EMP soon;" "desperately seeking gf all posts are satire." Feb 17, 2019 6:43 p.m. "Fine! You don't have to be my sex slave, you can be my wife...one of them. Feb. 18, 2019 10:32 p..m. Are you in L.A.? It might be safer with me in Seattle:) 206-397-0036, Add me on WhatsApp.; Feb 15, 2019 10:27 A.m. Tell your bosses it is in their interests to give me a "stake" in the Jews, and by that I mean my dick in you, nothing violent lol;" March 14, 2019 11:17 p.m. "You can be my Israeli handler :).

DEFENDANT'S OBJECTIONS -- 18

LINDELL LAW OFFICES, PLLC
P.O. Box 379
Redmond, WA  98073
206-230-4922

1    The Government has not proven that Mr. Colasurdo's motive for making

2    threatening statements against the individuals in Count I was motivated by actions

3    they'd taken as either a government employee or a relative of a government employee.

4    Accordingly, this court should not apply a 6-level upward adjustment based on U.S.S.G.

5    §3A1.2(a).

6

7    Finally, Mr. Colasurdo should not receive a 3-level upward adjustment because

8    the Government has not proven beyond a reasonable doubt that Mr. Colasurdo targeted

9    the individuals named in Count II because they are Jewish.

10

11    DATED this 11th day of October, 2019.

12

13

14                                          *Eric Lindell*

15                                          Eric W. Lindell
                                            Attorney for Defendant
16                                          Ericlindell@Lindelllaw.com
                                            Lindell Law Offices, PLLC
17                                          P.O. Box 379
                                            Redmond, WA 98073
18                                          (206) 230-4922
                                            Eric@Lindelllaw.com
19

20

21

22

23

24

25

26    DEFENDANT'S OBJECTIONS -- 19

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on October 11, 2019, I electronically filed the foregoing

3

document with the Clerk of the Court using the CM/ECF System which will send

4

notification of such filing to the following:

5

6
      Todd Greenberg
      Assistant United States Attorney

7

8

9
                  s/Eric W. Lindell
                  Attorney for Defendant

10
                  Lindell Law Offices, PLLC
                  P.O. Box 379

11
                  Redmond, WA  98073
                  (206) 230-4922

12
                  Eric@Lindelllaw.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26
DEFENDANT'S OBJECTIONS -- 20